UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

LAURA L. CHARTRAW,

                    Plaintiff,

          v.                                    Case No. 16-C-807

CITY OF SHAWANO and
MARK KOHL,

                    Defendants.

---

## DECISION AND ORDER

---

Plaintiff Laura Chartraw filed suit against Defendants, the City of Shawano and its former

Chief of Police Mark Kohl, under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq.*,

for discriminating against her based on her sex and then retaliating against her when she complained.

Because the claims arise under federal law, this court has jurisdiction under 28 U.S.C. § 1331. The

case is now before the court on Defendants' motion for summary judgment. Also before the court

is Chartraw's motion for leave to file a sur-reply in opposition to Defendants' motion for summary

judgment. Chartraw's motion for leave to file a sur-reply will be granted, but it does not help her

case. Viewing the evidence in the light most favorable to her, the evidence she offers could not

support a verdict in her favor. Defendants' motion for summary judgment will therefore also be

granted.

## BACKGROUND

Laura Chartraw has been employed by the City of Shawano as a clerical specialist for the

Shawano Police Department since 1998. Pl.'s Proposed Findings of Fact (PPFOF) ¶ 1, ECF No. 63.

In 2003, then-Chief of Police Edward Whealon promoted Chartraw to lead clerical specialist. Defs.' Proposed Findings of Fact (DPFOF) ¶¶ 2, 4, ECF No. 49. As lead clerical specialist, Chartraw was the senior most clerical person in the Department and the Chief's secretary. *Id.* ¶ 2. She worked for four different police chiefs in her role as a clerical specialist: Norm John, from April 1998 to January 2001; Mark Kohl, from January 2001 to August 2002; Edward Whealon, from August 2002 to April 2014; Mark Kohl, from April 2014 to April 2017; and Dan Mauel, from April 2017 to the present. *Id.* ¶ 4. The Chief of Police is responsible for supervising all police department employees, including the lieutenants, police officers, community service officers (CSOs), and clerical staff. PPFOF ¶ 4. At all times relevant to the complaint, Mark Kohl was the Chief of Police. *Id.* ¶ 2.

It should be noted at the outset that the court's efforts to determine the disputed and undisputed material facts of the case have been unnecessarily complicated by the number of personal opinions (she's a complainer; Attorney Kalny found) and tendentious proposed facts and responses thereto (see 96-page Defendants' Reply to Plaintiff's Proposed Findings of Fact) the parties have submitted. In general, it is the admissible evidence of the material facts of the case, not what someone else thought about what was in someone's mind, that are key to deciding whether a motion for summary judgment should be granted. What follows is the court's attempt to set out, in the light most favorable to the plaintiff, the undisputed material facts as gleaned from the properly submitted evidentiary materials of the parties.

Chartraw alleges that she was subjected to a pattern of sexual harassment beginning on some unspecified date after Kohl became Chief of Police in April 2014. She then proceeds to describe a series of incidents that she believes would support a verdict in her favor. She alleges, for example, that shortly after Kohl started his tenure at the Shawano Police Department, he invited her to have

pizza and watch a movie with him, which she declined. PPFOF ¶ 15. Chartraw acknowledges, however, that Chief Kohl made similar offers to pick up dinner and a movie to whoever was present, regardless of gender, and he never asked her to go on a date. DPFOF ¶¶ 37–38.

Chartraw contends that Chief Kohl also made inappropriate comments about her appearance and the appearance of another female employee, Officer NiCole Hoffmann. In February 2015, Kohl noticed that Chartraw did not do anything with her hair and asked her why she was not wearing any makeup. PPFOF ¶ 17. At a later date, Kohl noted that Chartraw's hair "looked like hell" and stated "women look better with a smile and makeup on." *Id.* ¶ 18. In late-February or early-March 2015, Chief Kohl described the boots Chartraw wore as "hooker boots." *Id.* ¶ 16. Chartraw was offended by the comment and went to talk to him about it the following week. Kohl joked about the comment and again stated that her boots were "hooker" boots. *Id.* ¶ 27. Chartraw complained to Lieutenants Musloff and Rabideau about Chief Kohl's comments. *Id.* ¶ 20. In April 2015, Chartraw told Chief Kohl and Lieutenant Mauel that she did not appreciate the comments he made about her appearance. *Id.* ¶ 28. Chartraw does not dispute that after the meeting, Kohl did not comment on her appearance again.

She was also concerned with comments she overheard Chief Kohl make about NiCole Hoffmann. When discussing the Department's vacant night shift position, a position Officer Hoffmann had applied for, Chartraw overheard Chief Kohl state that he would rather hire a "strong man" for the position. *Id.* ¶ 21. The City eventually hired Hoffmann as an officer, and Chartraw overheard Chief Kohl comment that Hoffmann's chest was "too big and jiggly" to fit a standard bulletproof vest. *Id.* ¶ 22. The City ordered a custom vest for Officer Hoffmann. DPFOF ¶ 74. Chartraw also claims she overheard Chief Kohl make comments about Hoffmann's "lesbian glasses"

3

and her eating habits. She asserts she never heard Chief Kohl make comments about male employees' eating habits or weight. PPFOF ¶¶ 24–25. In September 2015, Chartraw complained to Chief Kohl about the comments he made about Officer Hoffmann. He responded that Officer Hoffmann was "one of the guys" and "can take it." *Id.* ¶ 29. Chartraw stated his comments were "not cool" and that other women can hear them. *Id.*

Although Chartraw asserts she was offended by Chief Kohl's comments about women, these comments were part of an unprofessional environment to which she also contributed. In particular, Chartraw sent Chief Kohl lewd and inappropriate emails. In April 2014, she wrote

> Mark,
> I attached a list of our job duties.
> Shall I order a large vat of lotion to ease the chaffing? I figured with all the hinder licking you have received and will continue to receive you may need it . . . also thinking of getting one of those "take a number" dispensers for outside your office . . .
> - have a warm and wonderful day.
> Laura

DPFOF ¶ 20. And on August 26, 2014, she summarized what had occurred on a day Chief Kohl was out of the office:

> According to Noah, this guy was just irate the cops showed up, fucked up their fucking, and he lost his boner. You don't even know what you've missed today.

*Id.*

Chartraw further reports that she was the recipient of Kohl's rude workplace behavior and angry outbursts but admits Kohl treated male employees that he had conflicts with in a similar way. After Chief Kohl became upset when Chartraw told him she would not be his "Confidential Secretary" and "narc" on her coworkers, Kohl accused Chartraw of "blowing the budget." PPFOF ¶¶ 33, 39. When Chartraw asked to meet with him to discuss his concerns, he indicated that

he did not want to meet with her because he was "too upset." *Id.* ¶ 34. She then sent him an email stating

> I am fully aware of how you "punish" employees who do not please you. At some moment in time, it would be great to have my supervisor request a conversation with me to explain to me all the ways in which I have failed. It is becoming more apparent that you are purposefully engaging in aggressive pressure and intimidation to punish me. I have come to you three times in the past week to discuss this situation but was put off on all three occasions.

ECF No. 56 at 10. Chartraw subsequently met with Chief Kohl and Lieutenant Mauel to discuss her concerns on May 6, 2015. PPFOF ¶ 35.

She later told City Administrator Brian Knapp during a May 2015 investigation regarding a male lieutenant's failure to promote claim, that Chief Kohl would punish employees he had problems with by making rude and unprofessional comments about their job performance to other employees. DPFOF ¶ 23. She cited three male employees as examples and explained,

> He was treating me like Jeff Heffernon was treated, like Mike Musolff was treated, like Kurt Kitzman was treated. The off-the-cuff lewd remarks, making comments about me to people that I supervise, indicating that there was wrongdoing, which there was none, that—I needed to clear that part of it. You can treat me however you want to treat me, whether I think it's professional or not. However, these comments that you're making to people that I supervise about my job performance or the sincerity with which a project was undertaken, we needed—I needed to talk to each—through each one of those.

ECF No. 53 at 10; PPFOF ¶ 54. Chartraw noted she had discussed her concerns with Chief Kohl, and they had resolved their issues. DPFOF ¶ 23.

Chartraw also cites an argument she had with Chief Kohl as evidence of his harassing outbursts. On November 4, 2015, Chartraw, Officer Jody Johnson, Officer Dan Conradt, and Lieutenant Mike Musloff met in the Department's channel room to discuss the Vision Committee's progress in creating the Department's new mission statement. PPFOF ¶ 63. Once Chief Kohl joined

the meeting, the Committee advised him that employees resisted the Committee's request for input and that it noticed low Department morale. *Id.* ¶ 65. After Chartraw repeated some of the sentiments already shared by the Committee, Chief Kohl became visibly angry, began yelling, and rose out of his chair. *Id.* ¶ 66. Chartraw claims she became fearful and thought he was going to grab her throat. *Id.* Chief Kohl and Chartraw began arguing in raised voices. DPFOF ¶ 103. Though Chartraw contends Officer Johnson stood up because she thought something might happen to Chartraw, PPFOF ¶ 67, Officer Johnson left approximately five minutes into the argument. DPFOF ¶ 104. Officer Conradt remained in the room because he felt uncomfortable leaving Kohl and Chartraw yelling at each other but did not believe Kohl acted in a manner that was physically threatening. He told Kohl and Chartraw to get with the program, and the meeting ended shortly thereafter. *Id.* ¶ 105. Officer Shane Strange walked Chartraw to her car once she left the channel room. PPFOF ¶ 67.

Officer Johnson sent the City of Shawano's Mayor, Lorna Marquardt, a text regarding the Committee meeting. She did not want Chief Kohl to know that she had spoken to Mayor Marquardt about the incident because she was afraid for herself and Chartraw. *Id.* ¶ 74. Chartraw emailed Marquardt about the incident the following day:

> I make the following statement with the knowledge that it may be shared with Chief Kohl and/or Brian Knapp and if that were to happen my employment with the city would be jeopardized. I am very disappointed and discouraged by the lack of direction at the Shawano Police Department. I had a meeting yesterday in which once again, Chief Kohl found it necessary to belittle and harassment [sic] and question my job performance with other employees present. I am completely devastated today and do not know what direction I will take. If you have any interest in yesterday's debacle, I am open to conversation. You may also want to contact Jody Johnson, Shane Stange or Dan Conradt. I believe all will agree the treatment I received yesterday was uncalled for, unprofessional, and inappropriate.

*Id.* ¶ 75. Mayor Marquardt did not share this email with City Administrator Knapp. *Id.* ¶ 76. Chief Kohl subsequently offered a tearful apology to Chartraw about the argument. *Id.* ¶ 77. Chartraw sent Marquardt a follow-up email on November 11, 2015 stating that Officer Johnson described the channel room argument as a "domestic dispute" (even though Johnson had left the room five minutes into the argument) and that Chartraw felt she was "treated differently because [she is] a woman." *Id.* ¶¶ 78–79. Mayor Marquardt did not talk to Chief Kohl about the email or forward it to the City Administrator. *Id.* ¶¶ 84–85.

On November 18, 2015, Marquardt called a meeting with Chief Kohl, City Administrator Knapp, Lieutenant Musloff, Lieutenant Rabideau, and Lieutenant Mauel. *Id.* ¶ 86. Although Defendants contend the purpose of the meeting was to discuss the ways in which the City could make the Department run more cohesively, Chief Kohl and the Lieutenants shared their concerns about Chartraw. *Id.* ¶¶ 90, 92. Lieutenant Musolff felt pressured to say that he agreed Chartraw was a problem employee and thought the meeting was an effort to reach a consensus that Chartraw was insubordinate. *Id.* ¶¶ 94–95. After the meeting, Chief Kohl provided Knapp with a timeline of documentation regarding his concerns with Chartraw's performance. *Id.* ¶ 98. The first entry began in April 2015, around the time Chartraw discussed her dissatisfaction with Chief Kohl's comments about her appearance. *Id.* ¶ 99. On November 20, 2015, Chartraw emailed Mayor Marquardt asking if she had discussed Chartraw's concerns with Chief Kohl. *Id.* ¶ 103. Marquardt responded that the discussions that occurred during the November 18th meeting would remain confidential. *Id.* ¶ 104. Chartraw claims she again complained to Mayor Marquardt in December 2015 and January 2016 that Chief Kohl harassed her and treated her differently because she is a woman. *Id.* ¶ 105.

Chartraw contends that, around this time, her job duties began to change. Chief Kohl required that Chartraw tell him when she left for breaks and where she went, smile more, make eye contact with him, and greet him. *Id.* ¶¶ 49, 51. Chartraw concedes that these same requirements were imposed upon Lisa Krause, the second clerical specialist. DPFOF ¶ 44. Chartraw also contends that after she expressed her dissatisfaction with Chief Kohl's conduct, he began asking about her ability to perform her job duties. In particular, Kohl asked Chartraw if she could "handle" her job and told her that if she could not, "we can do something about that." PPFOF ¶ 30. She states she did not participate in the hiring process as she had in the past and was no longer included in management meetings. *Id.* ¶¶ 42, 43. Chartraw concedes that at the time of her deposition, a management meeting had not been scheduled in at least five months. She further asserts she was no longer responsible for completing the Uniform Crime Reports (UCRs), even though she was the "resident expert" on these reports. But this duty was taken away from her after the Department learned she was over one year behind in reporting. *Id.* ¶ 44.

On January 14, 2016, Chief Kohl advised Chartraw that she would no longer supervise the CSOs. *Id.* ¶ 106. He stated Lieutenant Mauel would begin supervising CSOs because they felt it was inappropriate for a non-officer to supervise officers. They also wanted to lessen Chartraw's workload. DPFOF ¶ 100. In a January 21, 2016 email, Chief Kohl reiterated that the CSOs "weren't taken away from [Chartraw] because of poor supervision." ECF No. 57 at 48. He also indicated he wanted to meet with Chartraw and Lieutenant Mauel "to talk about performance, office politics and [Chartraw's] responsibility as the Support Services Manager" and to "clarify some things and perhaps some misunderstandings." *Id.* Chartraw met with Chief Kohl and Lieutenant Mauel on January 22, 2016. During the meeting, Chartraw complained that she did not like CSOs entering

her workspace to use the extra computer in her office and requested that the computer be removed to limit her distractions. DPFOF ¶ 96. She also requested that the CSOs not ask her questions. *Id.* ¶ 97. Chartraw and Chief Kohl agreed that the computer would be moved and that the CSOs would direct any questions they had to Lieutenant Mauel, rather than Chartraw. Once the computer was removed from her office, Chartraw complains that she could not make department identification badges and was required to leave her office throughout the day to complete her work. PPFOF ¶¶ 45–46.

Chartraw further contends she did not receive a 2% raise for calendar year 2016 that Chief Kohl had promised her. In 2014, Kohl recommended, and the City's Finance Committee approved, a 6% wage increase for Chartraw that would begin in calendar year 2015. This was the highest raise of any city employee for that year other than Chief Kohl and Deputy Administrator Eddie Shepard. DPFOF ¶ 82. In 2015, Chief Kohl recommended to the Finance Committee that Chartraw receive a 2% raise for calendar year 2016. When the Committee denied Chartraw the 2% raise, Chief Kohl met with Mayor Marquardt and requested that his cost of living increase be split between Chartraw and Krause. He told Chartraw about the proposal in a meeting that occurred the day after their channel room argument:

> When I fought, when people didn't want you to be office manager, and I fought that you had to get a pay raise, you know what I got for it? Yeah, okay, thanks, but it's still not enough. . . . I was ready to go to Carla and say, What can I do to get rid of my pay raise to give it to you guys? To give it to you [Laura] especially. Okay? . . . I got to figure out how I can give my 2 percent – because I don't want – with everything that's been happening this year, I don't feel comfortable getting a raise. I'm thinking, Okay, maybe I can give an extra 1 percent to Laura and Lisa. Okay? Then all of a sudden yesterday happened. I'm like, Wow.

*Id.* ¶ 79. Chartraw ultimately received a 1% raise, the same cost of living increase that was approved by the Finance Committee for all department employees.

On February 1, 2016, Chartraw told Mayor Marquardt that she felt intimidated, uncomfortable, and harassed by Chief Kohl. She asserted Chief Kohl treats women unethically, treats Chartraw differently, and yells at her. *Id.* ¶ 111. Chartraw met with City Administrator Knapp on February 3, 2016, stating that she felt she was the subject of discrimination and retaliation. *Id.* ¶ 115. The City subsequently hired a local attorney to conduct an investigation into Chartraw's complaints. *Id.* ¶ 118. After receiving the investigation report, Knapp told Chartraw that the City did not feel that sufficient evidence of illegal discrimination existed to pursue further action. *Id.* ¶ 133. Chartraw subsequently outlined additional concerns she had for Knapp. *Id.* ¶ 139.

On March 8, 2016, Chartraw submitted a Charge of Discrimination to the Wisconsin Equal Rights Division and Equal Employment Opportunity Commission (EEOC), asserting that the Department retaliated against her for participating in a May 2015 investigation of Lieutenant Musolff's complaint that Chief Kohl erred in failing to promote him. DPFOF ¶ 21. Her EEOC charge states:

> In April 1998, I began my employment with the Respondent. In May or June 2015, I was a witness in a grievance filed against the Respondent by a Lieutenant, who was denied a promotional opportunity. In May and June 2015, Mark Kohl, Chief of Police, threatened to demote me on two different occasions. Additionally, Chief Kohl has required me to inform him when I leave the building and directed me to say "good morning" and "good night" each work day. In late 2015/early 2016, I was denied a 2% wage increase that I was promised.
>
> I believe that the Respondent discriminated against me on the basis of my sex (female) and retaliated against me for being witness in the above mentioned grievance, by subjecting me to harassment and different terms and conditions of employment, in violation of Title VII of the Civil Rights Act of 1964, as amended and Section 704(a).

*Id.* ¶ 28. Based on its investigation, the EEOC was "unable to conclude that the information obtained establishes violations of the statutes" and issued a right to sue letter. ECF No. 53 at 55.

Chartraw filed this lawsuit alleging discrimination and retaliation in violation of Title VII on June 24, 2016. Dan Mauel replaced Chief Kohl as the Chief of Police in April 2017. PPFOF ¶ 142.

## LEGAL STANDARD

Summary judgment is appropriate when the moving party shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). All reasonable inferences are construed in favor of the nonmoving party. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* Summary judgment is properly entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2012) (internal quotations omitted).

## ANALYSIS

### I. Chartraw's Motion for Leave to File a Sur-reply

As an initial matter, Chartraw requests leave to file a sur-reply in opposition to Defendants' motion for summary judgment. Defendants oppose the request. "The decision to permit the filing of a sur-reply is purely discretionary and should generally be allowed only for valid reasons, such as when the movant raises new arguments in a reply brief." *Meraz–Camacho v. United States*, 417 F. App'x 558, 559 (7th Cir. 2001); *see also Schmidt v. Eagle Waste & Recycling, Inc.*, 599 F.3d 626,

631 n.2 (7th Cir. 2010). Chartraw's sur-reply addresses new arguments and evidence presented by Defendants in their reply brief. Therefore, Chartraw's motion for leave to file a sur-reply is granted.

## II. Motion for Summary Judgment

Defendants have moved for summary judgment on Chartraw's discrimination and retaliation claims. Defendants assert Chartraw's claims should be dismissed for failure to exhaust administrative remedies. Indeed, the failure to file a charge of discrimination with the EEOC alleging a violation of Title VII ordinarily results in dismissal unless the plaintiff can prove an equitable defense to excuse her failure to exhaust, such as waiver, estoppel, or equitable tolling. *See Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982); *Gibson v. West*, 201 F.3d 990, 993 (7th Cir. 2000). Chartraw's EEOC charge alleges only discrimination and retaliation based on her involvement in the Musolff grievance and not her current claims. But because Defendants did not raise this argument until their reply brief, that argument is waived. *Dexia Crédit Local v. Rogan*, 629 F.3d 612, 625 (7th Cir. 2010) ("[A]s we have often noted, arguments raised for the first time in a reply brief are waived."); *United States v. T & W Edmier Corp.*, 465 F.3d 764, 765 (7th Cir. 2006) ("[F]ailure to exhaust administrative remedies may be waived or forfeited, while an absence of subject-matter jurisdiction may not."). The court will now address each of Chartraw's claims in turn.

## A. Discrimination Claim

Chartraw claims Chief Kohl and the City discriminated against her on the basis of her sex in violation of Title VII. Title VII prohibits an employer from discriminating against an employee on the basis of the employee's race, color, religion, sex, and national origin. 42 U.S.C. § 2000e-2(a)(1). A plaintiff can prove discrimination through either the direct or indirect method of proof. *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 766 (7th Cir. 2016). Under the direct method, the plaintiff must

12

point to direct or circumstantial evidence showing that her employer subjected her to an adverse employment action on the basis of her sex. *Id.* Under the indirect method, the plaintiff may proceed under the burden-shifting framework described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1983), by establishing that "(1) she is a member of a protected class, (2) she performed reasonably on the job in accord with her employer's legitimate expectations, (3) despite her reasonable performance, she was subjected to an adverse employment action, and (4) similarly situated employees outside of her protected class were treated more favorably by the employer." *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 696 (7th Cir. 2006). If the plaintiff satisfies this burden, then the employer must articulate "a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual." *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017). "No matter the framework employed, the ultimate legal question 'is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, religion, or other proscribed factor caused the discharge or other adverse employment action.'" *Reed v. Freedom Mortg. Corp.*, 869 F.3d 543, 547 (7th Cir. 2017) (quoting *Ortiz*, 834 F.3d at 765).

Defendants maintain Chartraw cannot satisfy the elements of either method because she has not suffered an adverse employment action. "An adverse employment action is 'some quantitative or qualitative change in the terms or conditions of [the plaintiff's] employment that is more than a mere subjective preference.'" *Madlock v. WEC Energy Grp., Inc.*, 885 F.3d 465, 470 (7th Cir. 2018) (quoting *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003)). But not everything that makes an employee unhappy can be considered an actionable adverse employment action. Otherwise, "minor and even trivial employment actions that an irritable, chip-on-the-shoulder

employee did not like would form the basis of a discrimination suit." *O'Neal v. City of Chicago*, 392 F.3d 909, 911 (7th Cir. 2004). The Seventh Circuit has recognized three general categories of actionable, materially adverse employment actions: "(1) termination or reduction in compensation, fringe benefits, or other financial terms of employment; (2) transfers or changes in job duties that cause an employee's skills to atrophy and reduce future career prospects; and (3) unbearable changes in job conditions, such as a hostile work environment or conditions amounting to constructive discharge." *Barton v. Zimmer, Inc.*, 662 F.3d 448, 453–54 (7th Cir. 2011) (citing *Herrnreiter v. Chi. Hous. Auth.*, 315 F.3d 742, 744–45 (7th Cir. 2002)). A materially adverse employment action is something "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004). The plaintiff must show that "material harm has resulted from . . . the challenged actions." *Haugerud v. Amery Sch. Dist.*, 259 F.3d 678, 692 (7th Cir. 2001).

Chartraw contends Defendants intentionally discriminated against her by creating a hostile work environment. In order to establish a Title VII claim based on a hostile work environment, Chartraw must present evidence tending to show that (1) the work environment was both subjectively and objectively offensive, (2) the harassment was based on her sex, (3) the conduct was severe or pervasive, and (4) there is a basis for employer liability. *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014). In determining whether a work environment is hostile, "a court must consider all of the circumstances, including the frequency and severity of conduct, whether it is threatening and/or humiliating or merely offensive, and whether the harassment unreasonably interferes with an employee's work." *Wittaker v. N. Ill. Univ.*, 424 F.3d 640, 645 (7th Cir. 2005) (quotations and citation omitted).

Even when looking at the evidence in the light most favorable to Chartraw, the court cannot conclude that she experienced severe or pervasive harassment that altered the terms and conditions of her employment. In the Seventh Circuit, workplace conduct of a sexual nature that upsets an employee is not always actionable. Although drawing the line between what is harassment and what is not is not always easy, the court has recognized that allegations of harassment fall on a spectrum: "On one side lie sexual assaults; other physical contact, whether amorous or hostile, for which there is no consent express or implied; uninvited sexual solicitations; intimidating words or acts; obscene language or gestures; pornographic pictures. . . . On the other side lies the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers." *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995) (citations omitted).

Chartraw does not allege that Chief Kohl physically touched her. Instead, she relies on various comments Kohl made to establish a hostile work environment. Verbal comments may constitute harassment only when they are sufficiently offensive and frequent. *See Scruggs v. Garst Seed Co.*, 587 F.3d 832, 841 (7th Cir. 2009); *see also Savino v. C.P. Hall Co.*, 199 F.3d 925, 933 (7th Cir. 1999) ("[T]he sporadic use of abusive language, gender-related jokes, and occasional teasing are fairly commonplace in some employment settings and 'do not amount to actionable harassment.'" (quoting *Breeding v. Arthur J. Gallagher & Co.*, 164 F.3d 1151, 1159 (8th Cir. 1999))). Chartraw supports her hostile work environment claim with the following allegations: Chief Kohl commented on her appearance, told her to smile more and to be cordial, criticized her work, yelled at her, invited her to get pizza and a movie, and commented on a female officer's appearance. This evidence, when viewed individually or as a whole, does not rise to the level of severe or pervasive conduct.

Chartraw contends Chief Kohl made repeated comments about her appearance. In February or March 2015, Kohl described the boots Chartraw wore as "hooker" boots. When she talked to him about the comment a week later, Kohl joked about the incident and again referred to Chartraw's boots as "hooker" boots. PPFOF ¶ 16. Plaintiff also asserts Chief Kohl made "multiple" and "ongoing" comments about her hair and makeup, but she can only describe two instances in which Kohl commented on her appearance. On the first occasion, Chief Kohl noticed that Chartraw did not do her hair and asked why she was not wearing makeup. On the second, Kohl commented that Chartraw's hair "looked like hell" and stated "women look better with a smile and makeup on." *Id.* ¶¶ 17–18.

Chartraw maintains these remarks were "ongoing" but provides no further evidence regarding the frequency with which Chief Kohl made these statements. She also concedes that after an April 2015 meeting with Chief Kohl and Lieutenant Mauel regarding Kohl's comments, Chief Kohl did not discuss her appearance again. Without additional evidence regarding the regularity with which Kohl commented on her appearance, the court cannot view the few comments described by the parties as pervasive. *See Ezell v. Potter*, 400 F.3d 1041, 1048 (7th Cir. 2005) (declining to find statements pervasive where plaintiff testified that discriminatory remarks were made on a "regular basis" but provided no additional detail as to what "regular" meant). And while Chartraw claims these comments were offensive, "mere offensive utterances" cannot be deemed severe enough to constitute actionable sexual harassment. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993); *see Patt v. Family Health Sys., Inc.*, 280 F.3d 749 (7th Cir. 2002) (finding that eight "isolated and sporadic" comments made by the alleged harasser, including a statement that "the only valuable thing to a woman is that she has breasts and a vagina," is not "severe or pervasive harassment"); *Weiss v.*

*Coca–Cola Bottling Co.*, 990 F.3d 333, 337 (7th Cir. 1993) (even though alleged harasser "asked [the plaintiff] for dates, called her a 'dumb blond,' put his hand on her shoulder several times, placed 'I love you' signs in her work area and attempted to kiss her in a bar," these incidents were "relatively isolated" and failed to meet the standard for actionable harassment). To a considerable extent, Chartraw complains about the unprofessional work environment to which she herself contributed. Defendants assert Chartraw and Chief Kohl were at one time friendly and mutually engaged in inappropriate banter. Chartraw emailed Kohl asking if she should order a vat of lotion to ease the chaffing from the "hinder licking" he had received. DPFOF ¶ 20. In the context of the parties' work relationship, Kohl's isolated comments on their own do not form the basis of a hostile work environment.

Chartraw also asserts Chief Kohl criticized her work, intimidated her, and argued with her. But Chartraw's treatment was not so severe or pervasive as to alter the conditions of her employment in a significant way. The Seventh Circuit has held that unpleasant critiques of a plaintiff's job skills, even when presented over a long period of time, do not create a hostile work environment. *Coffman v. Indianapolis Fire Dept.*, 578 F.3d 559, 564 (7th Cir. 2009); *see Patton v. Indianapolis Pub. Sch. Bd.*, 276 F.3d 334, 339 (7th Cir. 2002) (finding no hostile work environment even though plaintiff claimed her supervisors were rude, ignored her suggestions, failed to communicate changes at work, and severely criticized her without good reason); *Hilt–Dyson v. City of Chicago*, 282 F.3d 456, 463–64 (7th Cir. 2002) (noting that plaintiff's subjective belief that workplace conduct was demeaning and degrading is insufficient to create actionable harassment under Title VII).

Chartraw claims Chief Kohl's conduct during their November 4, 2015 argument in the channel room was based on her sex because he did not yell at the male employees in the room. "Harassment only constitutes discrimination because of sex if it exposes members of one sex to 'disadvantageous terms and conditions of employment to which members of the other sex are not exposed.'" *Williams v. City of Chicago*, 325 F. Supp. 2d 867, 875 (N.D. Ill. 2004) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)). Chartraw has not demonstrated that Kohl's conduct occurred because of her sex. Chief Kohl did not yell at other women in the room; he only argued with Chartraw. Chartraw further acknowledges that, by making "off-the-cuff lewd remarks" and criticizing her work in front of others, Chief Kohl "punished" her in the same way he punished male employees he did not agree with. Indeed, it appears Chief Kohl and Chartraw had an unhealthy working relationship and did not communicate well. The heated argument between Kohl and Chartraw was inappropriate and unprofessional. But "inappropriate conduct that is inflicted on both sexes, or inflicted regardless of sex" is outside the scope of Title VII because "bad workplace behavior . . . cannot be labeled discriminatory." *Holman v. Indiana*, 211 F.3d 399, 404–05 (7th Cir. 2000). In short, Chartraw has not established that Chief Kohl yelled at her or criticized her because of her sex. Likewise, Chartraw's suggestion that Chief Kohl's invitation to get pizza and go to a movie could be construed as a date is also unavailing. She concedes Chief Kohl made offers to pick up dinner and a movie to "whoever was standing there," regardless of gender, and that he never asked her on a date. DPFOF ¶ 37. His suggestion to get pizza was not based on Chartraw's sex, and thus does not add to the creation of a hostile work environment. *Holman*, 211 F.3d at 404.

Chartraw further contends Chief Kohl's comments about Officer NiCole Hoffmann contributed to a hostile work environment. When discussing the Department's vacant night shift position, a position that Officer Hoffmann had applied for, Chartraw overheard Chief Kohl state that he would rather hire a "strong man" for the position. PPFOF ¶ 21. The City subsequently hired Hoffmann as an officer, and Chartraw again overheard Chief Kohl comment that Hoffmann's chest was "too big and jiggly" to fit in a bulletproof vest. *Id.* ¶ 22. The City eventually ordered a custom vest for Officer Hoffmann. Chartraw also overheard Kohl comment about Hoffmann's "lesbian glasses" and note that she was "eating again." *Id.* ¶¶ 24–25. She contends she never heard Chief Kohl make comments about male employees' weight or their eating habits. Although these comments are still relevant in considering whether a hostile work environment exists, this type of "'second-hand harassment,' that is, comments not directed to the plaintiff, do not have the same impact as 'harassment directed at the plaintiff.'" *Hildebrandt v. Ill. Dept. of Natural Res.*, 347 F.3d 1014, 1035 (7th Cir. 2003) (quoting *Adusumilli v. City of Chicago*, 164 F.3d 353, 362 (7th Cir. 1998)). These isolated comments are neither severe nor pervasive and, when combined with Chartraw's other allegations, do not rise to the level of a hostile work environment.

Though Chief Kohl's conduct was at times unprofessional and representative of a less than ideal working environment, the record does not support an inference that his statements and conduct possess the requisite pervasiveness or severity necessary to create a hostile work environment. Though inappropriate, the events Chartraw believes support a verdict in her favor do not show a workplace permeated with discriminatory ridicule and insult. Title VII is neither a "general civility code" nor the intended remedy for complaints about the "ordinary tribulations of the workplace." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). Accordingly, the court grants summary

judgment in favor of Defendant Kohl as to Chartraw's Title VII harassment claims. Because the court has found that Chartraw has not satisfied the requirements of establishing discrimination, the court need not address whether there is an adequate basis for employer liability for Chief Kohl's actions.

## B. Retaliation Claim

Chartraw also asserts Defendants retaliated against her when she complained about what she perceived to be harassment. Title VII prohibits an employer from retaliating against an employee for engaging in protected activity, such as making a charge of discrimination. *Muhammad v. Caterpillar, Inc.*, 767 F.3d 694, 699 (7th Cir. 2014). Like discrimination claims, a plaintiff can prove retaliation through either the direct or indirect method of proof. Chartraw relies exclusively on the direct method. To establish a prima facie case of retaliatory disparate treatment under this method, a plaintiff must establish that (1) she engaged in a statutorily protected activity; (2) she suffered an adverse employment action subsequent to her participation; and (3) there was a causal link between the adverse action and the protected activity. *Metzger v. Ill. State Police*, 519 F.3d 677, 681 (7th Cir. 2008) (citing *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007)).

Chartraw's retaliation claim turns on whether she can demonstrate that she suffered an adverse employment action. Chartraw maintains that she suffered two adverse actions: (1) she did not receive a 2% raise she was promised and (2) Chief Kohl changed her job responsibilities. After considering Chartraw's evidence of adverse employment actions, the court finds Chartraw's claims amount to "petty slights or minor annoyances that often take place at work" and are not material adverse employment actions. *Crews v. City of Mt. Vernon*, 567 F.3d 860, 870 (7th Cir. 2009) (citation omitted).

First Chartraw asserts Chief Kohl withheld a 2% raise for calendar year 2016 that he had promised her. But as the Chief of Police, Kohl did not have the authority to change or control an employee's wages and could only recommend that an employee receive a raise. In 2014, the City's Finance Committee approved a 6% wage increase for Chartraw in calendar year 2015. This was the highest raise of any City employee other than Chief Kohl and Deputy Administrator Eddie Shepard. In 2015, Chief Kohl recommended Chartraw receive a 2% raise for calendar year 2016. When Chief Kohl learned the City's Finance Committee denied Chartraw the 2% raise, he met with Mayor Marquardt and requested that his cost of living increase for 2016 be split evenly between Chartraw and Lisa Krause, the clerical specialist. Marquardt advised Kohl that his cost of living raise could not be distributed to other employees. As a result, Chartraw received a 1% raise, the same cost of living increase that was approved by the Finance Committee for all department employees. The fact that Chartraw did not receive a 2% raise is not an adverse employment action.

Chartraw also asserts Chief Kohl took away her supervisory and managerial responsibilities. In particular, Chartraw claims she was no longer responsible for supervising the CSOs or completing the Department's UCRs, was not included in the hiring process, was not invited to management meetings, and was isolated from other employees. But when viewing Chartraw's allegations in light of her own deposition testimony and the other evidence in the record, the shifts in her duties and the changes in her interactions with others occurred after she complained she was overworked and distracted. For instance, Chief Kohl assigned UCR duties to Lieutenant Mauel and did not include Chartraw in the hiring process after Chartraw complained she had trouble completing her work and the Department discovered she was one year behind in finishing the UCRs. In January 2016, Lieutenant Mauel assumed the role of supervising the CSOs because both Chief Kohl and Lieutenant

Mauel felt it was inappropriate for a non-officer to supervise officers and to lessen Chartraw's workload. Chartraw also asserts she was no longer invited to attend management meetings after she reported the behavior she believed to be discriminatory, however, she concedes that these meetings are infrequent and, at the time of her deposition, there had not been a management meeting scheduled for five months. She further accuses Chief Kohl of forcing her to work in isolation because he removed an extra computer from her office and directed officers not to talk to her. Yet, Chartraw requested that the CSO computer be removed from her office because she did not like sharing her office space with them and wanted to limit her distractions. During this discussion, Chartraw and Kohl agreed that, in order to reduce the number of disruptions she encountered, the CSOs would direct any questions they had to Lieutenant Mauel, their new supervisor, rather than ask Chartraw questions.

It is worth noting that Chartraw was not terminated, demoted, or disciplined, and Chartraw's pay, title, hours, and opportunity for future advancement were not implicated by the change in her responsibilities. She has provided no evidence to establish that the sort of responsibilities she no longer performed were important to achieve a more senior position for which she was otherwise qualified or that she suffered a material harm. *See Traylor v. Brown*, 295 F.3d 783, 789 (7th Cir. 2002) (finding that plaintiff did not suffer adverse employment action even though employer did not allow her to perform the sort of responsibilities she wanted to perform because she did not suffer material harm). In short, Chartraw has failed to proffer evidence that would allow a reasonable jury to find that she experienced a materially adverse employment action. Accordingly, Chartraw cannot satisfy her prima facie case as a matter of law, and Defendants are entitled to summary judgment on this claim.

**CONCLUSION**

Based upon the foregoing analysis, Defendants' motion for summary judgment (ECF No. 50) is **GRANTED**.  Chartraw's motion for leave to file a sur-reply (ECF No. 76) is **GRANTED**.  The Clerk is directed to enter judgment dismissing the case with prejudice.

Dated this  12th  day of April, 2018.

s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court